# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

GRUNLEY CONSTRUCTION      *
COMPANY, INC.      *
     *
        Plaintiff      *
     *
v.      *     Civil No. PJM 04-3315
     *
XL SPECIALTY INSURANCE      *
COMPANY      *
     *
        Defendant      *

# OPINION

## I.

Grunley Construction Company, Inc. (Grunley) has sued XL Specialty Insurance Company (XL) for Breach of Performance Bond (Count I), Breach of Payment Bond (Count II), and Breach of (Takeover) Contract (Count III). The matter is before the Court on XL's Motion for Partial Summary Judgment and Grunley's Cross-Motion for Partial Summary Judgment.

The Court held oral argument on the Motions and took them under advisement. Having considered the pleadings and the arguments of counsel, the Court will GRANT XL's Motion and DENY that of Grunley.

## II.

In the Summer of 1999, the University of Maryland at College Park awarded Grunley a Prime Contract to construct additions and renovations to its  Adele H. Stamp Student Union (the Project).   On September 21 of that year, Grunley entered into a Subcontract Agreement with Roof Depot, pursuant to which Roof Depot agreed to furnish all labor, materials and equipment to complete the roofing, flashing, waterproofing and damp proofing in connection with the Project.

The Subcontract required Roof Depot to obtain a Performance Bond and a Payment Bond.  The Performance Bond was to ensure that the work Roof Depot had contracted to perform would be completed in the event that it defaulted on its contractual obligations; the Payment Bond was to ensure that Roof Depot's subcontractors and suppliers would be paid in the event that it defaulted on its obligations to pay them.

Roof Depot arranged both bonds through Intercargo Insurance Company, later known as XL.  Both the Performance and Payment Bonds had penal sums in the amount of $564,493 and both identified Grunley as the obligee.

In the Spring of 2001, after performing only a portion of the work required under the Subcontract, Roof Depot abandoned the Project.  On April 9, 2001, Grunley declared Roof Depot to be in default and promptly notified XL.

Under the terms of the Performance Bond, in the event of a default by the Principal (Roof Depot), the Surety (XL) had the option of taking one of the following actions pursuant to Paragraph 4 of the Bond:

4.   After the Obligee has declared the Principal in default and has satisfied the conditions of Paragraph 3, and the Surety has conducted its own prompt and reasonable investigation as to whether or not the Principal's default has actually occurred, the Surety may at its own option elect one or more of the following actions:

   4.1  Arranged for the Principal, with consent of the Obligee, to perform and complete the Contract; **or**

   4.2 Undertake to perform and complete the Contract itself, through its agents or through independent contractors; **or**

   4.3 Obtain bids or negotiated proposals from qualified contractor acceptable to the Obligee for a contract for performance and completion of the Contract, arrange for a contract to be prepared for execution by the Obligee and the Principal selected with the Obligee's concurrence to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Contract, and pay to the Obligee the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Obligee resulting from the Principal's default; **or**

   4.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

      4.4.1 After investigation, determine the amount for which it may be liable to the Obligee and as soon as practicable after the amount is determined tender payment therefore to the Obligee; or

> 4.4.2 Deny liability in whole or in
> part and notify the Obligee citing
> reasons therefor.

(Emphasis added.)

XL chose the takeover option pursuant to Paragraph 4.2 and the parties commenced a lengthy negotiation over the terms of a Takeover Agreement.  After Roof Depot abandoned but before the terms of the Takeover Agreement were agreed upon, Grunley hired a potential replacement contractor, Prospect Water Proofing, to perform roofing work that Grunley felt was of an emergency nature, deducting the payments it made to Prospect from the remaining Roof Depot contract balance.  As early as August 2001, XL tendered a completion contractor to Grunley, AEO Construction Company (AEO), but according to Grunley it had concerns over AEO's financial responsibility, which it communicated to Forcon International, XL's consultant.  XL submits that by April 2002 AEO was no longer interested in pursuing the roofing work on the Project because of Grunley's delay in signing the Takeover Agreement.

It was not until April 17, 2002 that Grunley signed the Takeover Agreement that XL had drafted and executed the previous December.

Among the relevant provisions of the Takeover Agreement were these:

• One of the recitals states that "the Surety [XL] has agreed to take over the work required by the Original Subcontract and complete the

Original Subcontract as the completing Surety in accordance with the terms of the Original Subcontract and this Takeover Agreement."

•   In Paragraph 2 Grunley acknowledges that XL, "by its execution of this Takeover Agreement . . . is acting in its capacity as the Surety of the Former Subcontractor, and that the Surety is not assuming any obligations or liabilities beyond those set forth in the Performance Bond."

•   Paragraph 10 provides that:

"The total liability of the Surety [XL] under this Takeover Agreement and the Performance Bond for the performance of the work, after expenditure of the contract balance, is limited to and shall not exceed the penal sum of the Performance Bond in the amount of $564,493.00   All payments properly made by the Surety for the performance of the Original Subcontract shall reduce the penal sum of the Performance Bond.  Nothing in this Takeover Agreement constitutes a waiver of such penal sum or increase in the liability of the Surety under the Performance Bond."

•   Paragraph 16 provides that Grunley "reserves unto itself all of the rights available to it under the Original Subcontract and this Takeover Agreement, except as stated otherwise in this Takeover Agreement."

•   And Paragraph 23 provides that "this Takeover Agreement shall be construed and enforced in accordance with the laws of the State of Maryland, without reference to conflict of law principles."

Eventually, pursuant to the Takeover Agreement, XL hired Arica Consulting and Subcontracting, LLC (Arica) to install the roofing work required by the specifications. Grunley alleges that in the Summer of 2004, it learned that XL, through Forcon, had directed Arica to cease work on the Project and that it had failed to pay Arica some $185,000 for work performed under XL's supervision.  Grunley further contends that it learned that a substantial portion of the built-up asphalt roofing that had been installed by Roof Depot prior to its abandonment of the Project needed to be torn out and reinstalled in order to satisfy the specifications of the Prime Contract, but when it called XL to return to the Project and complete this work, XL declined to do so.

Presumably Grunley has had to hire another roofing subcontractor to complete the work under the Prime Contract.

## III.

XL asks for summary judgment as to Counts I (Breach of the Performance Bond) and III (Breach of the Takeover Contract) insofar as Grunley seeks damages in excess of $564,493, the penal amount of the Performance Bond.  XL also asks for summary judgment as to Count III (Breach of the Payment Bond) on the grounds that no claims for labor or material have been made within the terms of the Bond.  In its Cross-Motion for Partial Summary Judgment, Grunley seeks judgment as a matter of law that XL has defaulted on its obligations under the Performance Bond, the Takeover Agreement, and Roof Depot's Original Subcontract.

## IV.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also Celotex v. Catrett, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate the absence of any material issue of fact. Celotex, 477 U.S. at 323. Once the moving party satisfies his initial burden, the non-moving party "may not rest upon his allegations," but must present evidence demonstrating the existence of a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court is obliged to view the facts and inferences drawn from the facts in the light most favorable to the non-moving party. Matsushita Elec. Indus. Comp. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

## V.

XL argues that its liability for breach of the Performance Bond and breach of the Takeover Agreement cannot, as a matter of law, exceed the total penal sum of the Performance Bond, $564,493, because that is what the parties expressly agreed to in the Takeover Agreement. Grunley argues that under the terms of the Performance Bond, the penal sum has no applicability to a surety's liability for its own breaches; that, because the surety agreed to takeover performance after Roof Depot's default, the surety is liable for all of Roof Depot's obligations under the Original Subcontract; that the penal sum limitation was waived upon election by the surety to complete performance for its defaulted principal; that the Takeover Agreement reaffirmed Grunley's rights under Roof Depot's Subcontract;

and that XL waived any right to claim that the Performance Bond or Takeover Agreement caps its liability by refusing to perform.

Grunley cites a number of cases in support of various of the propositions that it puts forth.  XL relies on a few Maryland cases dealing with payment bonds which it believes resolve the matter in its favor as a matter of law.

Maryland applies traditional rules of contract interpretation to surety agreements ensuring performance in payment bonds.  Republic Ins. Co. v. County Comm'rs of St. Mary's County, 68 Md. App. 428, 431; 511 A.2d 1136, 1137 (1986).

> "[T]he cardinal rule in interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles."

Women's Hosp. v. Fid. & Guar. Co., 177 Md. 615, 619, 11 A.2d 457, 459 (1940).

There can be no question that Grunley and XL modified the terms of the Performance Bond and the contracts to which the Bond related when they executed the Takeover Agreement.  To repeat, in the Takeover Agreement:

- One of the recitals states that "the Surety [XL] has agreed to take over the work required by the Original Subcontract and complete the Original Subcontract as the completing Surety in accordance with the terms of the Original Subcontract and this Takeover Agreement."

- In Paragraph 2 Grunley acknowledges that XL, "by its execution of this Takeover Agreement . . . is acting in its capacity as the Surety of the Former Subcontractor, and that the Surety is not assuming any

obligations or liabilities beyond those set forth in the Performance

Bond."

- Paragraph 10 provides that:

    "The total liability of the Surety [XL] under this
    Takeover Agreement and the Performance Bond
    for the performance of the work, after expenditure
    of the contract balance, is limited to and shall not
    exceed the penal sum of the Performance Bond in
    the amount of $564,493.00    All payments
    properly made by the Surety for the performance
    of the Original Subcontract shall reduce the penal
    sum of the Performance Bond.  Nothing in this
    Takeover Agreement constitutes a waiver of such
    penal sum or increase in the liability of the Surety
    under the Performance Bond."

- Paragraph 16 provides that Grunley "reserves unto itself all of the

    rights available to it under the Original Subcontract and this Takeover

    Agreement, except as stated otherwise in this Takeover Agreement."

- And Paragraph 23 provides that "this Takeover Agreement shall be

    construed and enforced in accordance with the laws of the State of

    Maryland, without reference to conflict of law principles."

The Court finds Republic Insurance Company, supra, to be dispositive of the

matter.  In that case, at trial, the surety for developers of a subdivision was held liable for

damages in excess of the face value of performance bonds.  On appeal, the surety's argument

for limiting its liability to the face amount of the bonds was "the unequivocal language in

each of the two bonds which explicitly stated that the aggregate liability of the surety on the

bond shall not exceed the sum thereof for any cause or reason whatsoever."

The Court of Special Appeals agreed with the surety and reversed the jury

verdict:

> "the bond, itself, clearly defined the total financial obligation of
> the surety.  That obligation, as so defined, was accepted by the
> County.  In accepting the bond with its condition of limited
> liability unambiguously stated thereon, the County passively
> consented to the liability limitation on the face value of the
> bonds."

Republic Ins. Co., 68 Md. App. at 432, 511 A.2d at 1138.

The Court of Special Appeals also held that no allegation of bad faith of the

surety's part would be permitted to circumvent the express limitation of liability on the face

of the bonds.

In the present case, the Takeover Agreement was the last operative document

executed between Grunley and XL, and there can be no dispute that it explicitly put to rest

any question of potential liability on the part of XL with regard to its obligations under the

Performance Bond and the Takeover Agreement in excess of a total of $564,493.  Most

directly on point is Paragraph 10 of the Takeover Agreement:

> "<u>The total liability of the Surety under this
> Takeover Agreement and the Performance Bond
> for the performance of the work, after expenditure
> of the contract balance, is limited to and shall not
> exceed the penal sum of the Performance Bond in
> the amount of $564,493.00</u>.  All payments
> properly made by the Surety for the performance
> of the Original Subcontract shall reduce the penal

sum of the Performance Bond.  Nothing in this
Takeover Agreement constitutes a waiver of such
penal sum or increase in the liability of the Surety
under the Performance Bond." (Emphasis added.)

As XL points out, all of Grunley's cases are factually distinguishable from the present case since none involved a takeover agreement that expressly provided that the parties were waiving the penal sum liability limitation under either the performance bond or the takeover agreement.

For these reasons XL's Motion for Partial Summary Judgment with regard to Counts I and III, insofar as it seeks to limit total possible damages recoverable by Grunley to $564,493, is GRANTED.[1]

## VI.

In Count II of the Complaint, Grunley alleges that in breach of the Payment Bond, XL failed to defend, indemnify and hold it harmless from claims by Arica  and other roofing suppliers and subcontractors.

Grunley argues that XL stepped into the shoes of Roof Depot and that all the work performed by Arica under the supervision of XL and Forcon was within the scope of Roof Depot's Subcontract Agreement which XL agreed to takeover.  Thus, according to Grunley, XL's payment bond obligations would continue until the work covered by the

---

[1]

That said, XL is not necessarily exonerated from liability for emergency work that may have been occasioned by Roof Depot walking off the job or for repair work that may have been necessitated by Roof Depot's substandard performance of the work while on the job.  Similarly, to the extent that the Subcontract calls for the defaulting party to pay attorney's fees or other costs, the Court does not address those issues in this Opinion. Even so, XL's total exposure remains capped at $564,493.

Prime Contract was complete and accepted by the Owner.  Finally, says Grunley, XL had

an implied duty to indemnify and hold it harmless because the Subcontract, whose "terms

and conditions" XL agreed to comply with, required XL to pay its subcontractors and

suppliers out of funds paid to XL.

XL asks for summary judgment in its favor as to Count II.

Again XL relies on the modification of the Bond by the Takeover Agreement,

this time with respect to any obligation that it might otherwise have had to make payment

to Arica.

Thus Paragraph 11 of the Takeover Agreement provides:

"Nothing herein shall alter or affect any obligation of the surety
and of the Payment Bond with respect to the Project, and the
Payment Bond shall remain in full force and effect according to
its terms and conditions, for work, labor, services, supplies and
material under or in connection with the Original Subcontract
through the date hereof.  All work, labor, services, supplies and
materials supplied after the date hereof, the parties agree shall
be the responsibility of the completion subcontractor and its
surety or sureties."  (Emphasis added.)

The Court agrees with XL that the Takeover Agreement expressly establishes

its obligations under the Payment Bond.  Under Paragraph 11, XL's only obligation to

Grunley under the Payment Bond is with respect to claims by subcontractors and suppliers

that provided labor material or equipment prior to the execution of the Takeover Agreement.

Any claims after the Takeover Agreement are the responsibility of the completion contractor

and its sureties, not XL.

On the facts, XL posits without dispute from Grunley that Arica supplied no labor material or equipment to the Project _prior_ to the execution of the Takeover Agreement, only afterwards.  Accordingly, Arica is not eligible to make a claim under the Payment Bond, nor is XL obliged to defend, indemnify or hold Grunley harmless against Arica's claim.  At the same time, there is no basis for Grunley's claim with respect to XL's alleged failure to defend, indemnify or hold Grunley harmless against claims of unidentified subcontractors or suppliers.  Any obligation on XL's part to defend, indemnify and hold Grunley harmless from such claims would arise only after Grunley had given XL notice under the Payment Bond and only after Grunley had tendered defense of such alleged claims. The record does not indicate that Grunley has ever done so.

The Court finds that XL is entitled to summary judgment with regard to Count II.

## VII.

For its part, Grunley asks for partial summary judgment as to XL's liability on all counts, alleging that there is no genuine dispute that XL defaulted on its obligations under the Performance Bond, the Takeover Agreement, and the Original Subcontract. XL, it says, has refused to return to the Project site and complete the unfinished work required by Roof Depot's Original Subcontract, including removal and replacement of the built-up asphalt roofing that was defectively installed by Roof Depot.

XL invites the Court's attention to conflicting evidence suggesting that it has made diligent efforts to fulfill its Performance Bond obligations.  It submits, inter alia, that it proposed to have Roof Depot complete the work, but that Grunley refused to allow this.  XL says it then tendered AEO to complete the work, but Grunley refused to permit that as well.  Finally XL says that, to its prejudice, the proposed Takeover Agreement sat for eight months with Grunley before Grunley got around to executing it.  XL avers that Grunley had its own obligations under the Performance Bond, including an obligation to protect the balance of the contract funds, which represented XL's collateral.  Specifically, says XL, Grunley had an obligation to review and inspect the flat roofing installed by Roof Depot and/or Prospect to make sure that it had been installed pursuant to the manufacturer's recommendations or as required by the contract documents.  Because it did not do so, says XL, Grunley improperly paid contract funds, which impaired XL's subrogation rights, as a result of which it was released from liability.

Grunley, on the other hand, contends that it fully complied with the terms of the Performance Bond in terminating Roof Depot; that XL never challenged the propriety of Roof Depot's termination before this lawsuit; that any delay by Grunley in executing the Takeover Agreement is irrelevant; and that XL has failed to identify any other evidence that would support a finding that Grunley breached any obligation to it such as would excuse XL's refusal to perform.

The Court has considered this welter of assertions and counter-assertions relative to the extent to which XL did or did not perform or was excused from performing

under the Performance Bond and other documents and is satisfied that at a minimum a genuine issue of material fact exists that precludes the entry of partial summary judgment in Grunley's favor.

For this reason, Grunley's Cross-Motion for Partial Summary Judgment as to XL's Liability [Paper No. 13] is DENIED.

## VIII.

A separate Order will be ENTERED implementing this Opinion.


_____/s/_____
**PETER J. MESSITTE**
**November 3, 2005**                    **UNITED STATES DISTRICT JUDGE**